[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 8, 2008
THOMAS K. KAHN
CLERK

No. 07-12058
_____

FAA No. 16-05-16

BMI SALVAGE CORPORATION, a
Florida corporation and
BLUESIDE SERVICES, INC., a Florida
Corporation,

                                                    Petitioners,

versus

FEDERAL AVIATION ADMINISTRATION,
MIAMI-DADE COUNTY, FL,

                                                    Respondents.

_____

Appeal from an Order of the
Federal Aviation Administration

_____

**(April 8, 2008)**

Before BIRCH and FAY, Circuit Judges, and HINKLE,* District Judge.

_____

* Honorable Robert L. Hinkle, United States Chief District Judge for the Northern District of
Florida, sitting by designation.

FAY, Circuit Judge:

We review a final decision of the Associate Administrator for Airports (the "Administrator") of the Federal Aviation Administration ("FAA") dismissing the complaint filed by BMI Salvage Corporation ("BMI") and Blueside Services, Inc. ("Blueside"), alleging that Miami-Dade County, Florida has violated applicable federal law and related FAA sponsor assurances by engaging in unjust discrimination in its operation of the Opa-Locka Airport.

Finding the current record lacks sufficient evidence for a meaningful review, we remand to the Administrator in order to give the parties the opportunity to present additional evidence. Should Miami-Dade County (the "County") fail to support its actions with non-discriminatory justifications, corrective steps and relief should be ordered.

## I. Background

In 1961, pursuant to the Surplus Property Act of 1944, the federal government conveyed Opa-Locka Airport (the "Airport"), a public-use, general aviation airport, to the County.[1] As a result, the County is bound by the terms of a

---

[1] See 49 U.S.C. § 47151-53.

quitclaim deed incorporating legal duties that arise from the Surplus Property Act.[2]

Furthermore, as the sponsor for federal grants received by the Airport as part of

the Airport Improvement Program (the "AIP"), the County is obligated to comply

with federal law and related FAA sponsor assurances. See 49 U.S.C. § 47107.[3]

In August 2005, Stephen O'Neal ("Appellant"), the owner and President of

BMI and Blueside, initiated this case by filing a formal complaint on behalf of

both companies with the FAA.[4] The complaint alleged many grievances with the

County and its management of the Airport, including claims that the County

violated specific provisions of federal law and related FAA sponsor assurances

requiring it to make the Airport available to the public without unjust

discrimination.

---

[2] Although the County is owner of and sponsor for federal grants received by the Airport, the Miami-Dade Aviation Department ("MDAD") actually operates the Airport. For simplicity, our references to the County include MDAD.

[3] The AIP was authorized by the Airport and Airway Improvement Act of 1982 ("AAIA"), as amended, 49 U.S.C. § 47101, et seq.

[4] In the interest of safety, security and development of civil aeronautics, the Federal Aviation Act of 1958, as amended, 49 U.S.C. § 40101, et seq., delegates to the FAA Administrator significant responsibilities for the regulation of air commerce. A person directly and substantially affected by an airport sponsor's alleged noncompliance with its legal duties is entitled to file a complaint with the FAA. See 14 CFR § 16.23 (West 2008) ("Part 16"). The complaint must provide a concise but complete statement of the facts relied upon to substantiate each allegation. The complaint must also describe how the complainant was directly and substantially affected by the things done or omitted by the airport sponsor. See 14 CFR § 16.23(b)(3, 4) (West 2008) .

BMI is a small aviation business specializing in the deconstruction and demolition of numerous categories of aircraft. In 1999, after relocating to the Airport from nearby Miami International Airport, BMI executed a five-year lease (the "1999 Lease") and began operating from 2.2 acres of a large concrete ramp at the Airport.

Since 1999, BMI has operated on the ramp from 13 temporary work containers and a mobile office. Beginning in 2002, because BMI's ramp contained no constructed facilities, plumbing or access to utilities, BMI made numerous formal and informal requests to the County to enter into a new lease that would permit BMI to occupy existing or develop new constructed facilities at the Airport. BMI alleges that the County ignored, delayed responding to or denied its numerous requests.

The 1999 Lease expired by its terms on December 31, 2004. Despite negotiations for a new long-term lease that occurred from October 2004 to August 2005, BMI currently operates on a month-to-month lease by operation of law. More than two years after the filing of the complaint, there has been no agreement on a new long-term lease. However, there is no evidence that the Airport has taken action to remove BMI from its premises. BMI continues to operate from a ramp at the Airport. In fact, twice during the proceedings below, in May and

4

December 2005, the County and BMI executed two Lease Modification Letters, which enlarged the Airport ramp space available to BMI on a month-to-month basis.

Appellant established Blueside, a Florida corporation and proposed tenant at the Airport, to provide fixed-base operator and aircraft repair services, as well as to eventually absorb BMI's demolition business.[5] In October 2004, Blueside executed a sublease agreement to develop and construct facilities at the Airport with the Opa-Locka Community Development Corporation ("CDC"), which has a 30-year lease with the County that enables it to develop significant portions of the Airport. Yet, Blueside currently does not operate at the Airport.

Sublease agreements entered into by CDC require the approval of the County. The County has not approved CDC's sublease with Blueside. There is some evidence in the record to the effect that the County's failure to approve the Blueside sublease is due, at least in part, to a default on CDC's development lease with the County. The decision of the Administrator and the determination of the Director of the Office of Airport Safety and Standards ("Director") do not probe into the specifics of the default or the reasons for the County's delay in approving

---

[5] A fixed-base operator is a commercial entity providing aeronautical services, such as fueling, maintenance, storage, ground and flight instruction to the public. See FAA Order 5190.6A, Airport Compliance Requirements (October 2, 1989).

the sublease.

Sometime shortly before Appellant filed his complaint, the County offered Blueside a five-year lease to occupy space on a ramp at the Airport. The lease appears similar, if not identical for all intents and purposes, to the 1999 lease. Appellant rejected the proposed lease because he argues that the lease is inadequate due to the five-year term and an opt-out provision that precludes him from obtaining the requisite financing necessary to develop constructed facilities on the ramp.

The Director reviewed the record evidence concerning Appellant's allegations of unjust discrimination in the awarding of long-term development leases and determined that the County's treatment of BMI and Blueside did not violate its federal obligations under 49 U.S.C. § 47107(a) and related Grant Assurance 22 (Economic Nondiscrimination). On administrative appeal, the Administrator affirmed the Director's decision and dismissed the complaint.

The issues on appeal have been distilled from the sweeping allegations in the complaint.[6] In this Court, Appellant focuses his argument on the County's

---

[6] Appellant's complaint included claims that the County was treating BMI and Blueside unfairly due to rule violations allegedly committed by BMI with respect to derelict aircraft and aircraft notification procedures. We do not address these allegations because the County denies the alleged violations had any impact on its decision whether to grant BMI and Blueside leases to occupy or develop constructed facilities. Therefore, we refrain from addressing whether such alleged violations, if they had been considered by the County, could be a basis for denying or

allegedly unjust discrimination in awarding certain Airport tenants leases to occupy or develop constructed Airport facilities, but refusing BMI and Blueside such leases. In addition to citing evidence that the County awarded leases to occupy or develop constructed Airport facilities to similarly-situated tenants, Appellant points to the County's failure to approve, or even offer a lease comparable to, Blueside's sublease with CDC.

According to Appellant, the Administrator erred when he accepted the County's legally insufficient reasons to explain why BMI and Blueside are not similarly-situated with tenants who received allegedly favorable leases. Further, Appellant argues that the County's defense that leases offered to BMI and Blueside were comparable to leases awarded to similarly-situated tenants is unsupported by the record.

## II. Standard of Review

We must apply the standard of review articulated in the Federal Aviation Act, 49 U.S.C. § 46110(c) (West 2008), and by default, the Administrative Procedure Act, 5 U.S.C. § 706 (West 2008), when reviewing a final decision of the Federal Aviation Administration dismissing a complaint filed under Part 16.

Under the Federal Aviation Act, the Administration's findings of fact are

---

delaying the approval of the desired leases.

conclusive if supported by substantial evidence. See 49 U.S.C. § 46110(c) (West 2008) ("Findings of fact by the . . . Administrator, if supported by substantial evidence, are conclusive."). We consider the record in its entirety "including the body of evidence opposed to the [FAA's] view," when reviewing the record for substantial evidence. NLRB v. S. Fla. Hotel & Motel Ass'n, 751 F.2d 1571, 1579 (11th Cir. 1985) (quoting Universal Camera v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Singer v. Garvey, 208 F.3d 555, 558 (6th Cir. 2000).

Even if two different conclusions can be drawn from the evidence, we may still find that the agency's factual findings are supported by substantial evidence. See S. Fla. Hotel & Motel Ass'n, 751 F.2d at 1579. Substantial evidence review "gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the court that the requisite fact exists, but merely the degree which could satisfy a reasonable factfinder." Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 377, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998) (italics omitted).

In addition, we must ascertain whether there is a rational connection between the facts found and the decision made by the agency. See Bowman

8

Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); Nat'l Wildlife Fed'n v. Marsh, 721 F.2d 767, 780 (11th Cir. 1983). Thus, not only must the agency's factual findings be supported by substantial evidence, but the agency's nonfactual analysis, including its interpretation of the governing statute, application of that statute to the facts, and conclusion must also be reasonable and not arbitrary and capricious. See South Dakota v. Civil Aeronautics Bd., 740 F.2d 619, 621 (8th Cir.1984); Starr v. FAA, 589 F.2d 307, 310 (7th Cir. 1978).

### III. Discussion

The federal government plays an important role in developing civil aviation through various legislative acts designed to develop airport facilities. Under programs that provide funds and surplus federal property to local communities, an airport's sponsor or owner is bound by certain obligations, either through contract or a restrictive covenant in the property deed or conveyance instrument, to maintain and operate the airport facilities safely, efficiently, and in accordance with specified conditions.

The Airport receives federal funds under such a program: the AIP. This program provides financial assistance to airport sponsors in exchange for binding

9

commitments designed to ensure that the public interest is served.[7]  These commitments were detailed in the County's applications for federal assistance and in the grant agreement, which includes a list of sponsor assurances incorporating applicable federal laws, regulations, executive orders, statute-based assurances, and other requirements binding on the County.  After acceptance of an AIP grant, the assurances become a binding obligation between the airport sponsor and the federal government, and the FAA has a statutory obligation to ensure that airport sponsors comply with their sponsor assurances.  See 49 U.S.C. § 47122 (West 2008).

In this case, Appellant alleges that the County has violated Federal Grant Assurance 22 (Economic Nondiscrimination), which provides that the County must make the Airport available "for public use on reasonable terms, and without unjust discrimination, to all types, kinds, and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport."[8]  Grant Assurance 22(a) (implementing 49 U.S.C. § 47107(a)(1)).[9]

---

[7]  The Secretary of Transportation is authorized to prescribe project sponsorship requirements to ensure compliance with the AAIA.  See 49 U.S.C. § 47107(g)(1) (West 2008).

[8]  As noted, the County's operation of the Airport is also bound by the terms of a quitclaim deed issued under the Surplus Property Act.  Property deeds issued under that Act provide in relevant part that "the property transferred hereby . . . shall be used for public airport purposes, and only for such purposes, on reasonable terms and without unjust discrimination."  This deed covenant mirrors Grant Assurance 22 thus, we do not address whether the County's

10

Specifically, BMI and Blueside claim the County violated Grant Assurance 22 when it awarded certain tenants, but not others, leases to occupy or develop constructed Airport facilities.[10]

BMI and Blueside claim in general that they are similarly situated with the Airport tenants who received favorable leases from the County. The Administrator and Director both acknowledged, however, that facts supporting these claims had not been clearly, concisely, or completely described as required by Part 16. Further complicating the effort to determine whether the tenants are similarly situated, the record includes what could be considered conflicting statements from BMI and Blueside.

For example, as noted by the Administrator, when describing how the County allegedly favored fixed-base operator Miami Executive Aviation, Appellant compares the County's treatment of Blueside, but then suddenly

---

obligations arise from the deed or contractual sponsor assurances because the analysis would be identical for purposes of our review.

[9] The obligation to make the Airport available to the public without unjust discrimination is necessarily balanced by provisions permitting the County "to establish such reasonable, and not unjustly discriminatory, conditions to be met by all users of the airport as may be necessary for the safe and efficient operation of the airport." Grant Assurance 22(h). Moreover, under Grant Assurance 22(i), the County may "prohibit or limit any given type, kind or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public."

[10] By failing to raise a violation of Grant Assurance 23 (Exclusive Rights) in his complaint, Appellant has waived his right to argue such a violation in this Court.

11

switches to statements regarding BMI, only then to jump back to statements regarding Blueside. The Administrator used this inconsistency to suggest that the record is not clear regarding which corporate entity wishes to establish a new aircraft repair station.

We must agree that while arguing their case below BMI and Blueside did themselves a disservice by muddying the record with the revolving use of corporate names and presenting indistinct business plans. However, certain record evidence deemed inconsistent by the Administrator is not, in our view, contrary to Appellant's express plans to eventually merge BMI and Blueside. We are able to reconcile many of these seeming inconsistencies by recognizing that these statements reflect both failed past efforts to expand BMI and present efforts to offer additional services through Blueside, which plans to possibly absorb BMI in the future.[11]

Our reading of the record clearly shows that BMI is an established aircraft demolition business that made numerous requests to obtain a more permanent leasing arrangement at the Airport. The record also clearly shows that Blueside is

---

[11] For example, the statement: "BMI Salvage Corporation made repeated requests to lease . . . in an effort to open a new aircraft repair station business" is not necessarily inconsistent with "Blueside is proposing to offer [fixed-base operator] services, which includes the creation of a . . . repair station which are totally different services from BMI, which [presently] offers aircraft teardown services."

a separate entity established by Appellant for the primary purpose of entering into a long-term lease to operate a fixed-base operator business. Further, we read the record as clearly demonstrating that Appellant attempted numerous times in vain to obtain permission to occupy or develop constructed facilities at the Airport for the purpose of opening an aircraft repair business.

There is potential confusion regarding the corporate name under which that aircraft repair business was to operate. However, there can be no mistake that Appellant made several requests, first through BMI then through Blueside, for a lease to occupy or develop constructed facilities at the Airport in order to open an aircraft repair business. The record may be lacking in certain specific details, some of which the County or third parties are likely in a better position to provide than BMI or Blueside. Nevertheless, we believe Appellant has stated with sufficient particularity his allegations that the County unjustly discriminated against BMI and Blueside by refusing to grant either company a lease to occupy or develop constructed facilities at the Airport.

Extracting from the record that BMI and Blueside wish to occupy or develop constructed facilities at the Airport for the purpose of operating aeronautical businesses, we must address Appellant's allegations that the County repeatedly delayed or denied BMI and Blueside leases to occupy or develop

constructed facilities while granting such leases to similarly situated tenants. The two specific tenants alleged to have received favorable treatment are Clero Aviation and Miami Executive Aviation. We begin with Clero Aviation.

In 2002, on at least two occasions, Appellant expressed to the County an interest in entering into a long-term lease that would enable BMI to expand and offer aircraft repair services. In February 2002, Appellant notified the County that he wanted to develop property at the Airport in a letter complaining that his phone calls to County-approved developers authorized to provide a long-term lease went unreturned for several years. In March 2002, Appellant sent a facsimile to a County official requesting permission to lease Building 407 at the Airport , a condemned building BMI offered to renovate at its own cost provided the County would partially offset such costs with lease credits. That request was not granted and the record provides no reason.

In contrast, the record shows that the County provided Clero Aviation a five-year lease to occupy a condemned building (Building 66). When that building failed inspection, the County and Clero Aviation promptly entered into a new three-year lease for a separate condemned building (Building 137). The recitals to the three-year lease state that Clero Aviation intended to occupy Building 137 while negotiations were simultaneously underway with the County

14

for Clero Aviation to construct a new facility on Airport property. The record also appears to demonstrate that the County agreed to finance, at least in part, the refurbishment and re-certification of those condemned buildings.

In the face of what could be reasonably interpreted as discriminatory treatment, the Administrator concluded that BMI and Clero Aviation were not similarly situated tenants and, in any event, the BMI and Clero Aviation leases were in fact comparable. The Administrator reasoned that Clero Aviation was not similarly situated because it entered into a lease to operate its *existing* repair station business, whereas the purpose of BMI's request was to open a new aircraft repair business and possibly continue its existing demolition business.

Yet, we find no evidence in the record regarding the relevance of this distinction to the County's decision whether to award an existing tenant access to a condemned building. Further, as we discuss below with respect to Miami Executive Aviation, a policy that awards leases merely based on whether a lessee operates an existing business or a new business likely violates the County's duty to refrain from granting exclusive rights to certain tenants.

In addition to Clero Aviation's operation of an existing repair station, the decision below noted there existed a non-aeronautical element to BMI's aircraft demolition business that gave the County a sufficient basis to discriminate in favor

15

of Clero Aviation, which does not have a non-aeronautical element to its business. The decision below clarified that BMI obtains aircraft and dismantles them, resulting in the aircraft never flying again, while Clero Aviation repairs non-flyable aircraft, permitting the aircraft to fly again. If we understand this distinction correctly, a demolition business is not similarly-situated with an aircraft repair business for purposes of awarding a lease to occupy a condemned building because the former has a non-aeronautical element.

The FAA concedes that "the receipt of aircraft onto the leasehold for demolition, along with a reasonable time period after the aircraft is last parked under its own power, is an aeronautical activity." BMI Salvage Corp. & Blueside Services, Inc. v. Miami-Dade County, Florida, FAA Docket No. 16-05-16, 2006 WL 2512974, at *10 (Dep't Transp. July 25, 2006) (Director's Determination). The implication, however, is that at some point in the demolition process BMI is no longer engaged in a completely aeronautical activity. The arguably hybrid nature of any aircraft salvage or demolition operation understandably presents challenges for the management of the Airport. We must consider these challenges in the context of reviewing a complaint alleging a violation of an airport sponsor's

federal obligations.[12]

We do not refute the obvious fact that the two businesses are engaged in different activities at the Airport. BMI is in the aircraft demolition business, while Clero Aviation is in the aircraft repair business. Thus, leases between these parties and the County would apply to businesses with different purposes. However, it is unstated in the record what relevance the different business purposes have to the decision whether to grant these particular existing tenants the right to refurbish and occupy condemned buildings. If, as the County argues and the record supports, BMI made proposals to expand its operation and add an aircraft repair business, the record is silent on what effect the proposed expansion has on whether BMI and Clero Aviation are similarly situated for purposes of leasing and refurbishing a condemned building. If BMI proposed to offer aircraft repair services, the parties' business purposes are less distinct.

Absent further explanation, we find the alleged non-aeronautical aspects of

---

[12] According to the Director, the challenges for a sponsor include the requirement to reserve aeronautical facilities for aeronautical activities; the requirement to charge fair-market value for the use of airport facilities for non-aeronautical purposes; the requirement to operate and maintain the airport in a safe and serviceable condition; and retaining the ability to develop aeronautical areas of the airport for purely aeronautical activities. Grant Assurance 24 includes the requirement to charge non-aeronautical, fair-market value rates for non-aeronautical activities at the airport. Further, the County's property deed and its Airport Layout Plan (ALP) designate aeronautical areas of the airport that must be used for aeronautical purposes, unless specifically authorized by FAA pursuant to a possible ALP change and notice to the public of the change from aeronautical to non-aeronautical use.

BMI's business to be an unpersuasive basis on which to conclude that the parties are not similarly situated.[13] The record provides no reason why the non-aeronautical element, if there is one, is a reasonable justification to distinguish between BMI and Clero Aviation. It is our understanding that presence at the airport is a prerequisite for BMI's demolition business. Aircraft must be flown to the site of BMI's business for demolition to begin. Therefore, the natural, perhaps only logistically feasible, place for such a business to operate is within the designated aeronautical area of the Airport.

The non-aeronautical element of BMI's business is at most *de minimis* in light of the need to locate an aircraft demolition business in proximity to aeronautical areas in the Airport. Until the County can explain how the hybrid nature of BMI's business is crucial to its decision whether to award a lease to occupy a condemned building, we find the current explanation for the apparently disparate treatment in this case to be deficient.[14]

---

[13] The FAA's definition of aeronautical activities does not explicitly rule out the possibility that a business such as BMI's is a completely aeronautical activity. A demolition business is not specifically included on the list of aeronautical activities; however, the list is by its terms not exhaustive. See Appendix 5 of FAA Order 5190.6A, Airport Compliance Requirements.

[14] The Director suggested the County could simultaneously accommodate BMI's demolition business and assure compliance with its federal grant assurances by providing a time limit to remove non-aeronautical parts from designated aeronautical areas. See BMI Salvage Corp. & Blueside Services, Inc., FAA Docket No. 16-05-16, 2006 WL 2512974, at *14 (Dep't Transp. July 25, 2006) (Director's Determination).

18

Importantly, the decision below also concluded that the leases under which

BMI and Clero Aviation operate are in fact comparable. BMI operated on a ramp

at the Airport pursuant to a standard five-year lease with a 30-day relocate or

vacate clause. Clero Aviation initially operated in Building 66 pursuant to a

standard five-year lease with a 30-day relocate or vacate clause. Clero Aviation

currently has a three-year lease for a separate building (Building 137) including an

option for an extension and a 30-day relocate or vacate clause.

During oral argument, Appellant emphasized the crippling nature of the

30-day relocate or vacate clause, which he argued prevents BMI from obtaining

financing to refurbish or construct facilities at the Airport. While we are

unpersuaded by the County's claims that the 30-day clause was included merely

for BMI's benefit (in which case the clause could be drafted to grant BMI a

unilateral right), it appears from the record that the 30-day relocate or vacate

clause is a standard provision in Airport leases. Even so, notwithstanding the

presence of a 30-day relocate or vacate clause in both leases, the leases are

glaringly different in a fundamental way: Clero is granted access to a building and

BMI is denied access to a building. Further, a 30-day relocate or vacate clause is

less damaging to a lessee where the lessor agrees to assume certain costs

associated with re-certifying and refurbishing the condemned building, as the

County agreed to do in the case of Clero Aviation.

We find the current record lacks sufficient legal and factual justification to support the conclusion that BMI and Clero Aviation are not similarly situated for purposes of leasing a condemned building. Substantial evidence in the record also indicates that BMI and Clero Aviation's leases are not comparable.

We turn next to Appellant's allegations that the County has unjustly discriminated against BMI and Blueside in favor of Miami Executive Aviation ("MEA"). According to Appellant, the County granted a 35-year development lease to MEA, which is a similarly situated aeronautical service provider that was not required to use an approved developer. However, as with Clero Aviation, the Administrator concluded that MEA is not similarly situated with BMI and Blueside.

By April 2005, the County was in the process of awarding a 35-year development lease to MEA, which is a fixed-base operator. We understand that when aeronautical tenants propose the same or similar use of the airport, if the level of investment and business aspects are dissimilar, the FAA may find the aeronautical users are not similarly situated. See Skydance Helicopters, Inc. d/b/a Skydance Operations, Inc. v. Sedona Oak-Creek Airport Auth. and Yavapai County, Ariz., FAA Docket No. 16-02-02, 2003 WL 1524500, at *27-28 (March

7, 2003) (Director's Determination).  In this case, however, we do not believe the record sufficiently demonstrates that BMI and Blueside are comparing themselves to an entity with dissimilar business aspects or levels of investment.

From the record we are able to discern that, prior to receiving a long-term 35-year lease, MEA conducted business through a standard five-year lease with a 30-day relocate or vacate clause.  However, once the five-year lease expired, the County provided MEA an opportunity to avoid the potential risk of developing on a short-term lease by entering into a long-term lease.  In contrast, since BMI's five-year lease expired, the County has not offered BMI a similar long-term lease and BMI operates from a ramp on a month-to-month basis.

The record sheds no light on why BMI's demolition business is sufficiently distinct from MEA's fixed-base operator business to justify differential treatment with respect to a long-term lease.  There may be numerous factors that could serve as the basis for legitimate distinctions, but we fail to see them in the record. Merely stating that one business is an existing tenant while another is a proposed tenant, or that one business is a fixed-base operator while another is a demolition business, is alone insufficient to justify differential treatment.

Even assuming *arguendo* that BMI's demolition business is sufficiently distinct from MEA's to justify differential treatment regarding the right to receive

21

a long-term lease to develop constructed facilities, Blueside and MEA have exactly the same business purpose. Aside from any confusion regarding the entity proposing to offer aircraft repair services, the record clearly shows that Blueside proposed to offer fixed-base operator services under a long-term sublease with CDC. Thus, there is scant evidence to conclude that the County's reliance on different business purposes was a legitimate justification to refuse to approve Blueside's long-term development sublease.

We note that Blueside finally secured a long-term development by entering into a sublease with an approved developer. However, more than three years later, the County has not ratified that sublease thereby preventing Blueside from developing at the Airport.[15] There is testimony in the record stating that the County has not approved the sublease because CDC is currently in default on its lease with the County. Nevertheless, the record shows only superficial efforts by the County to accommodate Blueside's plans to develop, which according to the County have been thwarted due to CDC's actions and not by any fault of Blueside.

The decision below gives dramatic consideration to the fact that MEA is a current tenant operating an established fixed-base operator business. Blueside, in

---

[15] Ratification by the County is required even though CDC is an approved developer at the Airport.

contrast, has never had a lease with the Airport and was proposing to introduce a new fixed-base operator business. The decisions below relied on this distinction to conclude that Blueside is not similarly situated with MEA. We find this distinction troubling. Permitting the County to award favorable leases to parties merely because they are established businesses would erect a potentially unsurmountable barrier to entry for new operators.

If the County were permitted to rely on this proffered reason alone, it would have a chilling effect on new businesses and operators seeking to establish themselves at the Airport.[16] There is no record evidence to explain why this particular new fixed-base operator should not be treated the same way as this particular established fixed-base operator. Because a lease for constructed facilities is essential to establish a fixed-base operation, the record should include details about MEA and Blueside that can serve as legitimate justifications for discriminating in favor of the established business over the new business.

The record indeed indicates that the County has offered Blueside a direct five-year lease. However, the proposed lease does not grant Blueside access to an existing building. Further, the lease is drafted for a term of five years, working

---

[16] Further, such a policy could be implemented in a way that would violate Federal Grant Assurance 23 (Exclusive Rights) by granting exclusive rights to existing businesses.

against Appellant's plans to develop at the Airport over the long-term. Negotiations for this lease appear to have stalled. There is some indication that Blueside may be rejecting the lease solely due to the five-year term and the 30-day relocate clause.

If the County can provide further evidence that the 30-day clause is standard in all Airport leases and that similarly situated tenants have used five-year leases with 30-day relocate clauses to successfully develop Airport property, Blueside will have less footing from which to argue that the proposed lease is discriminatory.[17] And, if the County's claim is genuine that the 30-day clause exists merely for the benefit of the lessee, the County should be willing at Blueside's request to revise the proposed lease to make the clause unilateral.

We do not suggest that the County has avoided negotiating in good faith with BMI and Blueside. The decisions below noted that the County had offered to work through various issues and even had expanded the amount of ramp space available to BMI under its month-to-month lease. Nevertheless, the record evidence paints a picture that over numerous years BMI and Blueside have been continuously denied without legitimate justification the right to occupy or develop constructed facilities at the Airport.

_____

[17] The record is devoid of any such evidence.

The proponent of a motion, request, or order has the burden of proof. Likewise, a party who has asserted an affirmative defense has the burden of proving the affirmative defense. This standard burden of proof is consistent with federal case law and the Administrative Procedure Act provision stating, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d) (West 2008). Therefore, we believe the County should have the opportunity to supplement the record, if it can, with legitimate explanations for its differential treatment of BMI and Blueside as compared to MEA and Clero Aviation.

We are not in a position to speculate concerning unarticulated motives the County may have had in denying BMI and Blueside the right to occupy or develop constructed facilities at the Airport. The record provides abundant instances of personal friction between Appellant and various County employees. Yet, having disclaimed any unarticulated motives and relying only on those discussed above, the County has not proffered valid, particularized reasons for denying BMI and Blueside the right to occupy or develop constructed facilities at the Airport.

Operating the airport for aeronautical use is a sponsor's primary obligation. Part of this primary obligation is the opportunity for leaseholders to develop airport property for aeronautical use. See United States Constr. Corp. v. City of

25

Pompano Beach, Fl., FAA Docket No. 16-00-14, 2002 WL 1821882 (July 10, 2002) (Final Agency Decision).  Federal assistance is not available for improvements to airports where the benefits of such improvements will not be fully realized due to inherent restrictions on aeronautical activities.

## IV. Conclusion

It would seem rather basic that the County would require all applicants who desired to do business at the Airport to provide evidence of financial stability, competence in the specific area of activity, the ability to comply with the laws and regulations governing such activity and similar fundamentals.  However, this record reflects nothing of the sort.  What we are holding is that it is not adequate under the law to deny an applicant the opportunity to operate at the Airport simply because there is an existing operator present.  There may be some maximum number of fixed-base operations that the activity at the Airport would support, but this record contains no such evidence.  It may be that some existing buildings are simply beyond refurbishing.  But this record is silent in that regard.  Negotiations can go on for extended periods.  However, when they go on for years, that fact alone raises serious questions about the lack of "good faith."  This record is simply inadequate for us to make a meaningful review.

Accordingly, we REMAND this case to the Administrator in order that he

may give the County the opportunity to present legally and factually sufficient justifications for its refusal or delay in awarding BMI and Blueside the opportunity to occupy or develop constructed facilities at the Airport.[18] In the absence of such, corrective steps should be ordered.

REVERSED and REMANDED with instructions.

---

[18] We note that the County stated that it was "ready, willing and available" to work towards executing a lease that will accommodate Appellant's business needs. We are encouraged by this statement and, given that several years have passed since this statement was made, this case could become moot if the parties were to set aside their past disagreements and agree on a lease that will enable Appellant to occupy or develop constructed facilities at the Airport.