[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-12583
_____

Agency No. FAA 16-05-16

BMI SALVAGE CORPORATION,
a Florida corporation,
BLUESIDE SERVICES, INC.,
a Florida corporation,

Petitioners,

versus

FEDERAL AVIATION ADMINISTRATION,
MIAMI-DADE COUNTY, FLORIDA,

Respondents.

_____

Petition for Review of a Decision of the
Federal Aviation Administration

_____

(July 19, 2012)

Before TJOFLAT, PRYOR and KRAVITCH, Circuit Judges.

PER CURIAM:

The Opa-Locka airport, which is owned by Miami-Dade County, Florida (the County), is a public-use, general aviation airport not used for commercial flights. Because the County obtained the airport property through a federal grant, it was subject to various grant assurances designed to promote the public interest through the safe and efficient use of airport property. 49 U.S.C. § 47107. Relevant to this petition for review is Grant Assurance 22, which requires the County to "make its airport available . . . without unjust discrimination, to all types, kinds, and classes of aeronautical activities."

In 2005, BMI Salvage Corporation (BMI) and Blueside Services, Inc. (Blueside), filed a complaint with the Federal Aviation Administration (FAA), alleging that the County engaged in unjust discrimination under Grant Assurance 22 in connection with leases for airport property. The FAA initially determined that there was no violation. After this court reversed and remanded, *BMI Salvage Corp. v. FAA*, 272 F. App'x 842 (11th Cir. 2008) (*BMI I*), the FAA concluded that BMI did not engage in aeronautical activities and thus was not covered by Grant Assurance 22, and that the other lease holders BMI identified were not similarly situated to BMI and Blueside as required to establish discrimination.

2

In this petition for review, we must determine whether the FAA properly concluded that salvage and demolition are not aeronautical activities and that the other lease holders were not similarly situated to BMI and Blueside. After a thorough review of the record, and with the benefit of oral argument, we conclude that the FAA's interpretation of aeronautical activities is entitled to deference. We further conclude that the other lease holders are not similar to Blueside. Accordingly, we deny BMI and Blueside's petition for review.

## I.

Prior to 1999, the County entered into lease agreements with various entities to develop much of the airport's property. In 1999, Stephen O'Neal, owner of BMI, signed a five-year lease for ramp space at the airport to conduct demolition and salvage of old planes. While still leasing the ramp space, BMI sought a new lease that would include building space. Despite several years of negotiations, the County and BMI never entered into such a lease. BMI's original lease ended in 2004 and it has continued to lease the ramp space on a month-to-month basis. To date, the County has made no effort to remove BMI from this space. *BMI I,* 272 F. App'x at 843-44.

3

In 2004, O'Neal established Blueside, a fixed-base operator[1] (FBO) that would provide aviation repair services. O'Neal intended that Blueside would eventually subsume BMI's demolition and salvage business. Blueside was not a current airport tenant, but it sought a long-term development lease that would include both ramp space for its demolition and building space for its FBO repair operations. When Blueside was unable to obtain such a lease, it negotiated a sublease with the Opa-Locka Community Development Center (CDC), one of the existing lease holders, to develop a section of the CDC's property at the airport, and it submitted this sublease for the County's approval as required. Although the County never approved the sublease, it later offered to lease Blueside ramp space for a five-year leasing term.[2] Blueside rejected the deal because some of the terms were undesirable. *Id.*

In 2005, BMI and Blueside filed a complaint with the FAA under 14 C.F.R. § 16.23 (Part 16 complaint), alleging the County engaged in unjust discrimination

---

[1] A fixed-base operator provides aeronautical services such as fueling, maintenance, storage, and instruction. *See* FAA Advisory Circular 150/5190-6, Appendix 1 § 1.1(i) (Jan. 4, 2007).

[2] As the County explained, it could not approve the sublease because CDC was in default on its lease and the County was considering termination of the lease agreement with the CDC.

4

when it awarded only certain tenants leases to develop the property.[3]  Specifically,

BMI alleged that Miami Executive Aviation (MEA) and Clero Aviation (Clero)

were treated more favorably when the County entered into a thirty-five year

development lease with MEA and a three-year lease that included building space

with Clero.

The FAA dismissed the complaint, finding that the County did not violate

Grant Assurance 22.  The FAA noted that salvage and demolition had both

aeronautical and nonaeronautical components, and thus BMI and Blueside were

covered entities entitled to protection from unjust discrimination under the grant.

Nevertheless, the FAA found that Clero and MEA were not similarly situated to

BMI and Blueside and thus dismissal was warranted.[4]

BMI and Blueside filed a petition for review, and this court concluded that

the record was not sufficiently developed to enable it to determine whether Clero

and MEA were similarly situated to BMI and Blueside.  *BMI I*, 272 F. App'x at

848.  This court considered the FAA's concession that demolition was an

---

[3]  BMI and Blueside raised several other issues in their Part 16 complaint, but these issues are not before us.

[4]  The FAA repeatedly noted that O'Neal referred to BMI and Blueside interchangeably throughout the Part 16 complaint, while at the same time indicating that the two were separate legal entities.  The FAA found that this made it difficult to discern his arguments regarding unjust discrimination.

5

aeronautical activity, although the court recognized that at some point in the process the activity would no longer be aeronautical. *Id.* at 848-49. In light of this hybrid nature of BMI's demolition services, this court concluded that the non-aeronautical component was at most *de minimis*, and that "[a]bsent further explanation, . . . the alleged non-aeronautical aspects of BMI's business [were] an unpersuasive basis on which to conclude that the parties are not similarly situated." *Id.* at 849. Therefore, this court reversed and remanded, instructing the FAA to give the County the opportunity to "present legally and factually sufficient justifications" for its decisions. *Id.* at 847-53.

On remand, the FAA requested that the parties supplement the record, and it instructed the parties to answer a series of questions about available airport property and BMI/Blueside's interest in various lease options. After considering the additional evidence and the parties' answers to those questions, the FAA concluded that (1) aircraft salvage and demolition operations are non-aeronautical activities, and thus Grant Assurance 22 did not require the County to lease space to BMI; (2) the County was willing to lease undeveloped property to BMI/Blueside, but BMI/Blueside found that some of the available property was unusable and that a lease excluding a full-time salvage component was unacceptable; and (3) Clero and MEA were not similarly situated to BMI and

6

Blueside.  BMI and Blueside again petition for review.

## II.

We apply the standards of review articulated in the Federal Aviation Act, 49 U.S.C. § 46110(c), and the Administrative Procedure Act, 5 U.S.C. § 706, when reviewing the FAA's final decision dismissing a Part 16 complaint.  The FAA's findings of fact are conclusive if supported by substantial evidence.  *See* 49 U.S.C. § 46110(c).

## III.

Grant Assurance 22 required the County to "make its airport available . . . without unjust discrimination, to all types, kinds, and classes of aeronautical activities."  Grant Assurance 22(a).[5]  The Grant Assurance further provides that the County "may establish such reasonable, and not unjustly discriminatory, conditions to be met by all users as may be necessary." Grant Assurance 22(h).

---

[5] The FAA is authorized to promulgate regulations and issue orders necessary to carry out its obligations under the Federal Aviation Act and the Airport Improvement Act of 1982.  49 U.S.C. § 40113(a).  By statute, the FAA must obtain written assurances that the tenant will comply with federal requirements, including that "the airport will be available for public use on reasonable conditions and without unjust discrimination."  49 U.S.C. § 47107(a).  Grant Assurance 22 is the FAA's regulation complying with its statutory mandate.  *See, e.g.*, 49 U.S.C. § 47122(a) ("The Secretary of Transportation may take action . . . necessary to carry out this subchapter, including . . . prescribing regulations and procedures, and issuing orders.").  BMI and Blueside do not dispute that Grant Assurance 22 is a reasonable interpretation of the FAA's statutory mandate.  They challenge only whether the FAA's definition of aeronautical, as found in the Advisory Circular, is a reasonable interpretation of the Grant Assurance.

7

Thus, by its very terms, the Grant Assurance 22 protects only those entities engaged in aeronautical activities.

Since at least 1965, the FAA has considered aeronautical activities to be "any activity which involves, makes possible, or is required for the operation of aircraft, or which contributes to or is required for the safety of such operations." FAA Advisory Circular 150/5190-1A §5(b) (1985), *cancelled by* FAA Advisory Circular 150/5190-5 (June 10, 2002); *see also* 30 Fed. Reg. 13,661 (Oct. 27, 1965).  This included aircraft sales, the sale of aircraft parts, and aircraft storage. *See* FAA Advisory Circular 150/5190-7, Appendix 1 §1.1(a) (August 28, 2006) (*cancelling* FAA Advisory Circular 150/5190-5).  Over the years, the FAA has refined its view and it now defines an aeronautical activity as:

> any activity that involves, makes possible, or is required for the operation of aircraft or that contributes to or is required for the safety of such operations.  Activities within this definition, commonly conducted on airports include, but are not limited to, the following: general and corporate aviation, air taxi and charter operations, scheduled and nonscheduled air carrier operations, pilot training, aircraft rental and sightseeing, aerial photography, crop dusting, aerial advertising and surveying, aircraft sales and services, aircraft storage, sale of aviation petroleum products, repair and maintenance of aircraft, sale of aircraft parts, parachute or ultra light activities, and any other activities that, because of their direct relationship to the operation of aircraft, can appropriately be regarded as aeronautical activities.  Activities such as model aircraft and model rocket operations are not aeronautical activities.

8

FAA Advisory Circular 150/5190-6, Appendix 1 § 1.1(a) (January 4, 2007).

An agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citations and quotation marks omitted); *see also Sierra Club v. Johnson*, 436 F.3d 1269, 1274 (11th Cir. 2006). We will uphold the agency's interpretation of its regulations "so long as it is reasonable, that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations." *Id.* (internal citation omitted). We also give deference to changes in an agency's position "if the agency adequately explains the reasons for the reversal of policy." *National Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); *see also Motor Vehicles Mfrs. Ass'n of U.S., Inc. v, State Farm Mutual Auto. Ins. Co*, 463 U.S. 29, 42 (1983) ("[A]n agency must be given ample latitude to adapt their rules and policies to the demands of changing circumstances." (internal quotation marks omitted)).

Here, the FAA determined that BMI's salvage and demolition operations were not aeronautical activities and, therefore, that Grant Assurance 22 did not apply. The FAA gave three reasons for its finding that salvage was not an aeronautical activity. First, the FAA explained that the official FAA definition of aeronautical activities did not include salvage and demolition. According to the

9

official definition, aeronautical activities are those required for operation of an aircraft. Demolition and salvage are not necessary for the operation of an aircraft.[6]

Second, the FAA noted that the list of activities that would qualify as aeronautical, although not exhaustive, showed the agency's intent to focus on the "direct relationship to the operation of aircraft." Salvage and demolition, however, had no such relationship. The FAA recognized that "the receipt of aircraft onto the leasehold for demolition, along with a reasonable time period after the aircraft is last parked under its own power, is an aeronautical activity," but "the lengthy business of disassembling the aircraft after that flight is not." And although the FAA acknowledged that the sale of the various airplane parts would be an aeronautical activity, it nevertheless concluded that the recovery of those parts during demolition did not need to be done on airport property. The FAA conceded that demolition and salvage needed to be done *near* the airport and explained that an aircraft could be towed off-site after its final flight for the actual

---

[6] The fact that the County enacted standards for the salvage and demolition process does not make the activity aeronautical. The County enacted minimum standards to comply with the grant assurances, to enforce its rules, and to ensure safe and efficient airport operations. *See Flightline Aviation, Inc. v. City of Shreveport*, 2008 WL 5955355, at *10 (FAA Mar. 7, 2008). Minimum standards can limit nonaeronautical activities that would jeopardize the safe and efficient operation of the airport. *See, e.g. Ashton v. City of Concord*, 2001 WL 865709, at *13 (FAA Apr. 17, 2001) ("It would appear that the City was reasonable in taking action regarding the Complainant's nonaeronautical behavior in order to preserve standards of conduct that are consistent with the safe and efficient operation of the Airport.").

10

demolition work.[7]

Third, the FAA drew an analogy to manufacturing aircraft or aircraft parts, which it did not consider aeronautical activities.  The FAA noted that the aircraft manufacturing was often done off airport property.

Having considered the FAA's reasoning, we conclude that its interpretation of salvage and demolition as nonaeronautical work is reasonable.  "Operating the airport for aeronautical use is not a secondary obligation; it is the prime obligation." *United States Constr. Corp. v. City of Pompano Beach, Fla.* 2002 WL 1821882 (FAA July 10, 2002) (internal quotation marks omitted).  Not every action involving an aircraft is deemed aeronautical, and the FAA is entitled to draw a line between what is aeronautical activity and what is not.  Because the FAA's interpretation is not plainly erroneous or inconsistent with the statute, we conclude that the FAA's finding that demolition is non-aeronautical is entitled to deference.

Finally, we disagree with BMI and Blueside that our prior decision in *BMI I* constitutes law of the case.  Our previous opinion merely explained that the FAA's determinations were insufficiently supported, and we gave the FAA the

---

[7]  The FAA suggested that demolition was an appropriate "through-the-fence" operation with access to the airport but not on airport property.  *See* FAA Advisory Circular 150/5190-6.

11

opportunity to obtain additional evidence and make adequate findings to enable our appellate review.  This does not equate with a binding legal conclusion about the FAA's interpretation of its own regulation under the law-of-the-case doctrine. *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 891 (11th Cir. 2011) (noting that the law-of-the-case doctrine applies to findings of fact and conclusions of law and that there is an exception to the doctrine where there is new evidence).

## IV.

Because the FAA's definition of aeronautical activities is entitled to deference, the FAA properly dismissed BMI's Part 16 complaint.  As BMI did not engage in aeronautical activities, it was not subject to Grant Assurance 22's requirements.

But the FAA does not dispute that Blueside would be covered by Grant Assurance 22 because its FBO operations are an aeronautical activity.[8] Nevertheless, the FAA properly dismissed Blueside's complaint because, even applying Grant Assurance 22, the evidence in the record shows that Blueside was not similarly situated with Clero and MEA.[9]

---

[8] We note that the FAA has not determined and the record does not enable us to discern how much nonaeronautical activity a company can have and still be covered by the Grant Assurance.

[9] In its questions to the parties on remand, the FAA asked whether the County would consider a lease that included a salvage component.  The County indicated that it would not, and

12

> In order for the [FAA] to sustain an allegation of unjust economic discrimination . . . the record must show that another party similarly situated to the Complainant received preferential treatment denied to the Complainant in similar circumstances . . . The FAA has acknowledged that several factors can distinguish parties that a sponsor can justly treat differently, without violating its Federal obligations. Such factors may be: period of lease, business plan proposed, location of facilities, level of service and amenities, scope of services, investment, market conditions, and reasonable actions by the sponsor to promote and protect its ability to continue to serve the interests of the public in civil aviation, including the enlistment of prudent business practices that may change over time.

*Alca v. Miami-Dade County*, 2010 WL 3826299, *33 (FAA Aug. 31, 2010).

The FAA found that BMI/Blueside[10] was not similarly situated to Clero for several reasons. First, the two entities had different purposes. Clero was a certified repair station, whereas Blueside was an FBO that would include a demolition and salvage component. Second, Clero was currently occupying a building that had been condemned, necessitating its relocation to other building space. BMI/Blueside had no building space.[11] Third, Clero's repair operations

---

it explained its reasons for enacting a policy prohibiting full-time salvage operations at the airport. In response to the questions posed to them, BMI and Blueside indicated that they would not consider a lease that did not allow for a full-time salvage and demolition operation. Thus, the parties appear to be at an impasse that does not implicate Grant Assurance 22.

[10] We again note that O'Neal used BMI and Blueside interchangeably. Although we have disposed of the claims BMI makes, we use BMI/Blueside here to be consistent with the FAA's findings.

[11] Out of 37 buildings on airport property, 21 were condemned during the County's recertification in 2004. Thus, the County had to relocate and/or repair the buildings for its existing leaseholders before it could consider new building leases.

13

required an enclosed building facility to comply with FAA regulations, but it could otherwise be located anywhere on airport property.  BMI/Blueside's salvage work required ramp space and a certain type of paved area to comply with environmental regulations; thus, once Blueside subsumed BMI's salvage operations, it would require access to ramp and building space, which limited the space it could lease.

The FAA further found that BMI/Blueside was not similarly situated to MEA for several reasons.  First, MEA was an FBO that did not engage in any demolition or salvage work, but Blueside planned to eventually encompass BMI's demolition and salvage component and thus it rejected a proposed lease without a full-time salvage component as unacceptable.  And MEA had submitted plans for the proposed development construction it agreed to in its lease and evidence of financial ability to complete the project, but BMI/Blueside only stated it was willing to commit "sufficient funds" and submitted no evidence to show financial viability.

On this record, we conclude that substantial evidence supports the FAA's conclusions that BMI/Blueside was not similarly situated to Clero or MEA.

## V.

For the foregoing reasons, we conclude that the FAA properly dismissed

14

BMI and Blueside's Part 16 complaint.  Accordingly, we deny the petition for review.

**PETITION DENIED.**

15